# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

—————————————

№ 13-CV-243 (JFB) (WDW)

—————————————

ANN MARIE KRACHENFELS,

Plaintiff,

VERSUS

NORTH SHORE LONG ISLAND JEWISH HEALTH SYSTEM
AND NORTH SHORE UNIVERSITY HOSPITAL,

Defendants.

—————————————

**MEMORANDUM AND ORDER**
July 29, 2014

—————————————

JOSEPH F. BIANCO, District Judge:

Plaintiff Ann Marie Krachenfels ("Krachenfels" or "plaintiff") commenced this action against North Shore Long Island Jewish Health System (the "Health System") and North Shore University Hospital (the "Hospital") (collectively, "defendants") on January 15, 2013, alleging disability discrimination in violation of the Americans with Disabilities Act, 42 U.S.C. §§ 12101 *et seq.* ("ADA"), and the New York State Human Rights Law, N.Y. Exec. Law §§ 290 *et seq.* ("NYSHRL"), and age discrimination in violation of the Age Discrimination in Employment Act, 29 U.S.C. §§ 621 *et seq.* ("ADEA"), and the NYSHRL. A former operating room nurse at the Hospital, plaintiff claims that she was denied a reasonable accommodation for her hand condition (discoid dermatitis), subjected to a hostile work environment because of her discoid dermatitis and her accommodation

request, denied a transfer to a different part of the Health System even though a younger nurse was granted such a transfer, and was constructively discharged.

Defendants move for summary judgment pursuant to Federal Rule of Civil Procedure 56. For the reasons set forth herein, the Court grants the motion as to all the federal claims. First, plaintiff's failure to accommodate and hostile work environment claims are time-barred because they accrued more than 300 days before plaintiff filed a charge of discrimination with the Equal Employment Opportunity Council ("EEOC"). Plaintiff's failure to accommodate claim accrued on July 13, 2010, and plaintiff's reliance on the continuing violation doctrine to support the timeliness of this claim is unavailing; the failure to accommodate is a discrete act, not a continuing violation. Plaintiff's hostile work environment claims are also untimely

1

because plaintiff left work more than 300 days before filing her claim with the EEOC; thus, the last act contributing to the allegedly hostile work environment could not have occurred within the applicable limitations period. Although plaintiff claims that she was denied the ability to transfer to a different position while on leave and within the limitations period, this has no bearing on plaintiff's hostile work environment claim, which requires evidence of harassment in the "workplace." Second, even assuming that plaintiff's failure to accommodate claim were timely, the Court concludes that it fails as a matter of law because there is no evidence that plaintiff was disabled within the meaning of the ADA. Third, plaintiff has failed to raise a triable issue of fact as to whether she was constructively discharged. Even resolving all factual disputes in favor of plaintiff and viewing the evidence in the light most favorable to her, a reasonable jury could not find that plaintiff's treatment in the workplace was objectively intolerable, that defendants deliberately created such an environment, or that any behavior about which plaintiff complains occurred in circumstances giving rise to an inference of discrimination. Fourth, plaintiff's retaliation claim fails as a matter of law because defendants' failure to transfer her—the only action taken by defendants that falls within the applicable limitations period—does not constitute an adverse employment action in this case. Specifically, plaintiff has proffered no evidence concerning the positions that she sought, and it is therefore impossible to determine whether the failure to transfer well might have dissuaded a reasonable worker from making or supporting a charge of discrimination. Moreover, even if plaintiff could establish a *prima facie* retaliation claim, defendants have proffered uncontroverted evidence that plaintiff did not secure a transfer because she applied to positions for which she was not qualified,

did not return calls for interviews, and did not conduct herself professionally in interviews. This evidence shifts the burden to plaintiff to establish that retaliation was a motivating factor in defendants' decision not to transfer her, and in this case, there is no such evidence. Fifth, plaintiff's age discrimination claim, which is also premised on defendants' failure to transfer her, also fails because plaintiff cannot show that she was denied a transfer to a materially more advantageous position. Additionally, plaintiff has not created a triable issue of fact as to an inference of age discrimination. Plaintiff relies solely on the fact that another nurse ten to fifteen years younger than she received a transfer; however, plaintiff offers no evidence about the other nurse's qualifications, the assignment that the other nurse received, or whether plaintiff had applied for that position and was qualified for it. In sum, the Court grants summary judgment for defendants on all of plaintiff's federal claims. Because the Court grants summary judgment to defendants on all federal claims, the Court declines to exercise supplemental jurisdiction over the state law discrimination claims.

## I. BACKGROUND

### A. Facts

The following facts are taken from the parties' depositions, declarations, exhibits, and respective Local Rule 56.1 statements of facts. Upon consideration of a motion for summary judgment, the Court construes the facts in the light most favorable to the nonmoving party. *See, e.g.*, *Capobianco v. City of New York*, 422 F.3d 47, 50 n.1 (2d Cir. 2005). Unless otherwise noted, where a party's Rule 56.1 statement is cited, that fact is undisputed, or the opposing party has not

pointed to any evidence in the record to contradict it.[1]

## 1. The Parties

The Health System is a regional non-profit healthcare network of member hospitals, progressive care centers, long-term care facilities, and home health agencies. (Defs.' 56.1 ¶ 1.) The Hospital is a member hospital located in Manhasset, New York. (*Id.*)

Plaintiff began working for the Hospital as a Registered Nurse ("RN") in 1983. (*Id.* ¶ 6.) Around 1996, she was assigned to work part-time in the operating rooms of the Hospital's Cardiac Surgery Unit ("CSU"). (*Id.* ¶ 7.) As such, she was designated a "Perioperative RN-OR." (*Id.* ¶¶ 5, 7.) Plaintiff held that position until February 9, 2011, after which she took a leave of absence. (*Id.* ¶ 9; Pl.'s 56.1 ¶ 9.1.) She formally resigned from her position on August 2, 2011. (Defs.' 56.1 ¶ 84.)

## 2. Duties of a Perioperative RN-OR

During weekday business hours, each operating room in the Hospital had either two nurses or one nurse and one Surgical Technologist ("Surgical Tech"). (*Id.* ¶ 27.) If two nurses were present, then one performed "circulating" duties while the other performed "scrubbing" duties. (*Id.* ¶ 28.) If a Surgical Tech were present instead of a second nurse, then the nurse would circulate and the Surgical Tech would scrub. (*Id.* ¶ 29.) Circulating duties entailed, *inter alia*, ensuring the safe transfer of the patient to the operating room, providing assistance to anesthesia personnel, performing skin preparation, documenting the plan of care, assessing needs of the medical team, and handling all specimens. (*Id.* ¶ 25.) Scrubbing duties entailed, *inter alia*, checking all instruments and assisting the surgeon during the operation by handling those instruments. (*Id.* ¶ 26.) The scrubbing nurse (or Surgical Tech) worked closely beside the surgeons and often came into physical contact with the patient and the surgical site. (*Id.*) Accordingly, although all nurses and Surgical Techs in the operating room would wash their hands and put on gloves before every operation, the person performing the scrubbing duties also had to be completely sterile throughout the operation. (*Id.* ¶ 30–31; Pl.'s 56.1 ¶¶ 30.1–31.2; *see also* Krachenfels Dep. at 100 ("The scrub is sterile and the circulator is not.").)

Each specialty area in the Hospital, such as the CSU, had its own on-call procedures and staffing requirements to ensure the availability of qualified staff outside weekday business hours. (Defs.' 56.1 ¶¶ 32–33, 35.) On-call shifts for the CSU ran from 7:00 p.m. to 11:00 p.m. and 11:00 p.m. to 7:00 a.m. on Monday through Friday, and forty-eight hours straight on Saturday and Sunday. (*Id.* ¶ 34.) Either two CSU nurses or a CSU nurse and a Surgical Tech were assigned to an on-call shift.[2] An on-call

---

[1] Although the parties' respective Rule 56.1 statements of facts contain specific citations to the record, the Court cites to the Rule 56.1 statement instead of the underlying citation to the record. However, the Court disregards all assertions in the Rule 56.1 statements that are unsupported by the record, relying only on the admissible evidence in the record. *See Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 73 (2d Cir. 2001) (noting that district court may disregard an assertion in a Rule 56.1 statement that is unsupported by record). The Court denies defendants' motion to strike plaintiff's Rule 56.1 Counterstatement of Facts, as there is no basis to do so.

[2] Debi Solivan ("Solivan"), HR Manager for the Hospital from 2005 to 2013, avers that two CSU nurses were always designated to take on-call assignments. (Solivan Aff. ¶ 16.) According to

nurse needed to be able to perform both circulating and scrubbing duties. (*Id.* ¶ 36; *see also* Cifu Dep. at 55 ("If you are on call, the expectation is that you can circulate and scrub."); Moleski Dep. at 41 ("Being on call, there is only two staff members on call, and they have to be able to scrub and circulate.").) This requirement was reflected in the Policy and Procedure Manual, which stated that any nurse "taking call must be able to scrub and circulate within their assigned specialty . . . in order to maintain a safe patient environment." (Solivan Aff. Ex. E, Manual, at 1.) The Policy and Procedure Manual went into effect in 1990 (Solivan Aff. ¶ 15), and the version in the record was last revised in November 2009 (*see* Solivan Aff. Ex. E, Manual, at 2). The Hospital required on-call nurses to be able to scrub and circulate in order to ensure patient safety. (Defs.' 56.1 ¶ 37.) Given that the Hospital was not fully staffed during on-call hours, an on-call nurse could have been the only nurse present during an operation, in which case she would have to scrub. Even if the two on-call nurses were present in the operating room, the circulating nurse needed to be able to scrub in case the scrubbing nurse became incapacitated.[3] (Solivan Aff. ¶ 18; Moleski Dep. at 40–45, 67.)

---

Patricia Moleski ("Moleski"), supervisor of the operating room, a Surgical Tech could have been on-call instead of a nurse, but nurses took on-call assignments more frequently than Surgical Techs. (Moleski Dep. at 42–43, 46.)

[3] Citing Moleski's deposition testimony, plaintiff claims that the CSU operating room was fully staffed twenty-four hours per day and that the Hospital employed a "pyramid system" to ensure understaffing. (*See* Pl.'s 56.1 ¶¶ 38–39.) The implication is that a nurse could have been on-call even if she could not scrub. Moleski's testimony does not support this assertion. When asked whether the CSU operating room was staffed twenty-four hours per day, Moleski responded, "With scheduled staff and then call staff." (Moleski Dep. at 66.) She

### 3. Plaintiff's Tenure in the CSU

Plaintiff worked as a Perioperative RN-OR in the CSU from 1996 to February 9, 2011. (Defs.' 56.1 ¶¶ 5, 7, 9.) When she worked part-time from 1996 through July 2010, she supplemented her income by working on-call shifts, for which she earned twelve dollars per hour if she was not called in, and time and a half her regular salary if she was called in. (Krachenfels Dep. at 114–16.) She worked on-call "all the time" in 2008, but she could not remember specific occasions. (*Id.* at 116–17.)

#### a. Plaintiff's Hand Condition and Her Requests to Avoid Scrubbing

Plaintiff experienced irritation of some kind on her hands in 2008 (Krachenfels Dep. at 169–72), and she first noticed open blisters and widespread rashes on her hands in 2009 (Defs.' 56.1 ¶ 101; Krachenfels Dep. at 136–38, 145–46, 150–51). No doctor ever discovered the cause of the rashes; her doctor diagnosed her with "discoid dermatitis," which, according to plaintiff, is a "catch-all for when they don't know what to call it." (Defs.' 56.1 ¶¶ 102–04.) Whenever her condition "flare[d] up" and blisters were present, she testified that showering became very painful and that she slept "[v]ery poorly" because the itching was "maddening." (Krachenfels Dep. at 151–52.) During this time, plaintiff scrubbed "from time to time"—when she "felt

---

clarified that only two nurses were available during on-call hours (*id.* at 41–42), which is consistent with Solivan's affidavit (*see* Solivan Aff. ¶¶ 16–18). Moreover, Moleski testified that "in an extreme emergency" when the two on-call nurses (or Surgical Techs) needed backup, the CSU would call in additional staff according to a pyramid system. (Moleski Dep. at 46–47.) That testimony in no way contradicts the evidence that all on-call nurses had to be able to scrub given the minimal staffing during on-call hours.

good"—although she stressed in her deposition that scrubbing was not required.[4] (Krachenfels Dep. at 163, 165.) She did not scrub because other nurses "loved to scrub," so she would let them do it. (*Id.* at 154–55.) On two occasions, her doctors provided her with notes indicating that she should not scrub for several weeks. (*Id.*; *see also* Morelli Decl. Exs. I & J.) She provided those notes to the Hospital, which temporarily excused her from her scrubbing duties. (Krachenfels Dep. at 169–72; *see also* Moleski Dep. at 26 ("Throughout many several years, there were issues where she had asked not to scrub because of her condition. So, at any time that she came to us, we would accommodate her.").)

Sometime in 2009, two nurses complained to management that certain nurses were not scrubbing. (Krachenfels Dep. at 155–56; Moleski Dep. at 47–48.) In response, Moleski told plaintiff and two other nurses, Ruth Adabody and Carol Ann Peralta ("Peralta"), that they had to scrub and circulate. (Krachenfels Dep. at 175.)

In January 2010, plaintiff informed the Hospital that she had a rash on her hands and requested that she be relieved from performing scrubbing duties whenever she had open lesions or blisters. (Defs.' 56.1 ¶¶ 43–44.) In support of this request, plaintiff gave the Hospital a doctor's note dated January 21, 2010, from Dr. Louise Kaufmann, which informed the Hospital that plaintiff was "being followed for her hands," and stated that plaintiff "should avoid

scrubbing for the OR when open lesions are present." (*Id.* ¶ 45; Solivan Aff. Ex. G, Doctor's Note.) Plaintiff explained that she gave the note to the Hospital "because they were now making it mandatory to scrub." (Krachenfels Dep. at 155.)

The Hospital's Perioperative Department referred plaintiff's request to Solivan, the Human Resources Manager responsible for employees in that department. (Defs.' 56.1 ¶ 47.) Solivan then referred the request to Employee Health Services ("EHS"), which reviewed requested accommodations from Hospital staff. (*Id.* ¶ 48.) On July 8, 2010, EHS informed Solivan that plaintiff had seen a specialist, who determined that plaintiff did not have a disability requiring her to be relieved of scrubbing, but that if she had open wounds, she needed to keep them covered while scrubbing. (*Id.* ¶ 50.) However, the Hospital's policy and practice prevented nurses from scrubbing if they had an open wound or lesion. (*Id.* ¶ 51.) Accordingly, on July 13, 2010, Moleski informed plaintiff that she would not have to scrub if she had lesions on her hands, but that she could no longer sign up for on-call shifts because an on-call nurse must be able to scrub. (*Id.* ¶ 52; *see* Moleski Dep. at 40.)

Because plaintiff was a part-time employee and could no longer sign up for on-call shifts, the Hospital offered plaintiff a full-time position. (Defs.' 56.1 ¶ 53.) The Hospital was able to exempt plaintiff from scrubbing if she worked full-time during normal business hours, when many other nurses are working. (*Id.* ¶ 54.) If plaintiff had lesions on her hand on a certain day and therefore could not scrub, one of the other nurses could perform that responsibility instead. (*Id.* ¶ 55.) Plaintiff testified that she accepted the position because she had no other choice. (Pl.'s 56.1 ¶ 53.1.) She realized that the Hospital was offering her a full-time position in an effort to make up

---

[4] Defendants dispute this fact. Solivan, Moleski, and Kelly Cifu-Tursellino ("Cifu"), director of the operating room as of 2010, claim that both circulating and scrubbing were always essential duties of a Perioperative RN-OR. (Solivan Aff. ¶ 12; Moleski Dep. at 40, 52, 55; Cifu Dep. at 49.) However, the Court assumes plaintiff's version of events for purposes of the present motion.

lost income from her inability to work on-call shifts (Krachenfels Dep. at 197), but the move from part-time to full-time nonetheless resulted in a "substantial loss" to her income given her inability to take on-call shifts (*id.* at 191).[5] Moreover, working full-time during the day forced plaintiff to "rearrange [her] entire schedule." (*Id.* at 195.)

On September 8, 2010, plaintiff informed Solivan that she thought scrubbing was causing her lesions, and that she wanted to be exempt from scrubbing all the time.[6] (Defs.' 56.1 ¶¶ 56–57.) In plaintiff's deposition, she explained that she did not want to scrub because of her discoid dermatitis. (Krachenfels Dep. at 201 ("Q: Okay. And because of your condition, can you scrub? A: I don't want to scrub.").) The Hospital granted plaintiff's request and completely exempted plaintiff from scrubbing duties. (Defs.' 56.1 ¶ 58.)

b. Incidents of Alleged Harassment

Plaintiff testified to several conflicts with her coworkers that occurred during the last few years of her tenure at the Hospital. On March 3, 2009, a relief nurse yelled at plaintiff for not counting four clamps in the operating room. (*Id.* ¶ 60; Pl.'s 56.1 ¶¶ 60.1–60.5.) According to plaintiff, the nurse resented her because she had been excused from scrubbing at that time, although plaintiff could not explain why she felt that

---

[5] Plaintiff's counsel claims that plaintiff lost approximately $30,000 of additional income, but he supports that fact only with allegations in the complaint. (*See* Pl.'s 56.1 ¶¶ 98.1, 99.2.)

[6] Plaintiff disputes this fact, relying on her deposition testimony that she would scrub when she "felt good." (Krachenfels Dep. at 166.) However, this testimony clearly related to 2009, not September 2010. Accordingly, it does not contradict the clear evidence that plaintiff requested not to scrub in September 2010. (*See* Solivan Aff. ¶ 24 & Ex. E.)

way. (Krachenfels Dep. at 240, 249–50, 252.)

In a separate incident during an operation on March 20, 2009, plaintiff refused to give instruments to the surgeon until he changed his gloves. The surgeon, Dr. Glassman, "shoved past" plaintiff, telling her to "get the fuck out of [his] way," and took the instruments himself. (Defs.' 56.1 ¶ 61; Krachenfels Dep. at 211–13.) After that incident, plaintiff was told to report to a different operating room. (*Id.* at 215–16.) Instead, she went to the Emergency Room because she was so upset from the incident, and the Emergency Room sent her home. (*Id.* at 216.) Although disciplinary action was commenced against plaintiff for abandoning her post, the discipline was ultimately reduced from a written warning to a verbal warning. (*Id.* at 219; Moleski Dep. at 73, 75.)

A different surgeon reported that he had experienced difficulties with plaintiff in the operating room on October 6, 2009, and that plaintiff's behavior was a recurring problem. (Defs.' 56.1 ¶ 64.) He requested that plaintiff no longer be assigned to his operating room. (*Id.*)

Plaintiff claims that the attitudes of her co-workers changed noticeably after she received her exemption from scrubbing in 2010. (Krachenfels Dep. at 249.) At her deposition, she referred to "badgering" that "became worse and worse on a daily basis." (*Id.* at 189.) She was "assuming" it was due to her inability to scrub. (*Id.*) One of her fellow nurses had told her explicitly that she did only fifty percent of her job. (Krachenfels Dep. at 253.) However, plaintiff could not articulate a reason for believing that others shared this sentiment. (*See id.* at 249 ("Q: Okay. You are claiming that you got an accommodation, and the attitude of these co-workers of yours

changed, correct? A: Uh-huh, yes. Q: And I'm asking you, what evidence do you have that suggests that those two things are linked? A: You would have to be there to understand it.").)

On April 9, 2010, plaintiff failed to report to an operating room as directed, and she received a "verbal counseling" for insubordination. (Defs.' 56.1 ¶ 66; *see* Morelli Decl. Ex. H, Verbal Conference.) Plaintiff indicated that she felt harassed. (Defs.' 56.1 ¶ 67; Pl.'s 56.1 ¶ 67.)

Plaintiff also testified that Cifu, who became director of the operating room in 2010, "harassed [her] constantly" (Krachenfels Dep. at 257–58), although she really did not know why (*id.* at 266–67). At some point in January 2011, she claims that Cifu put her on probation as the result of an incident plaintiff had with a surgeon (*id.* at 259–62), although probation was reserved only for orientation (Moleski Dep. at 57).

By February 9, 2011, Solivan claims that only three out of the seven surgeons in the CSU would work with plaintiff. (Solivan ¶ 31.) Cifu knew of one surgeon who did not want to work with plaintiff. (Cifu Dep. at 74.) On that date, plaintiff asked Cifu to change shifts, and Cifu pulled her aside and, according to plaintiff, yelled with her finger in plaintiff's face. (Krachenfels Dep. at 277–78.) Plaintiff also had one last dispute with a surgeon in the operating room on that day. (Defs.' 56.1 ¶ 69.) In the operating room, plaintiff noticed a contaminant in the prep kit used to prepare patients for surgery, and the surgeon became "really really angry . . . picked up the prep kit, and he threw it into the garbage and said fix it." (Krachenfels Dep. at 260). As a result of this incident, another nurse was sent to relieve plaintiff of her duties. (Defs.' 56.1 ¶ 70.) Plaintiff was told to collect herself and return to the operating room (*id.*); however, she left the

Hospital before her shift ended and did not return that day (*id.* ¶¶ 71–72). Plaintiff claims that she left because she felt sick to her stomach. (*See* Pl.'s 56.1 ¶¶ 71.2, 72.1.)

Just before leaving the Hospital, plaintiff spoke to Deirdre Duke ("Duke") in Human Resources. (Krachenfels Dep. at 324–25.) According to plaintiff, she told Duke that she could no longer tolerate working in the CSU operating room. (*Id.* at 325–26.) Duke assured her that the Health System would find her another position and referred her to Roseanne Verticchio ("Verticchio"), a nurse recruiter, to look for different job. (*Id.* at 326–27.)

Sometime shortly thereafter, plaintiff spoke with Solivan about the February 9, 2011 incident. (Defs.' 56.1 ¶ 75; Pl.'s 56.1 ¶ 75.) During this conversation, plaintiff requested a transfer to another position. (Defs.' 56.1 ¶ 77.) Solivan suggested that plaintiff take a leave of absence until she secured a new position, which plaintiff did. (Krachenfels Dep. at 339.) According to Solivan, Hospital supervisors decided not to place plaintiff in active performance counseling, which would have prevented plaintiff from transferring to a new position for twelve weeks. (Solivan Aff. ¶ 32.)

4. Leave of Absence

After the events of February 9, 2011, plaintiff looked for a new job within the Health System. According to plaintiff, Verticchio immediately referred her to her assistant, who was unhelpful, and Solivan suggested that she look outside the Health System altogether. (Krachenfels Dep. at 329–30, 340.) After a few months during which plaintiff claims she had to help herself, Verticchio informed plaintiff that there were four open positions to work the twelve-hour night shift on the "med/surg" floors. (*Id.* at 332.) Plaintiff felt the Hospital

was discriminating against her because those positions were only entry level. (*Id.*) According to Solivan, however, plaintiff's years of experience as an operating room nurse did not necessarily qualify her for other nursing positions. (Solivan Aff. ¶ 33 n.1.) Plaintiff conceded that a CSU Perioperative RN-OR would not necessarily be interchangeable with another type of nurse. (Krachenfels Dep. at 342.)

Solivan claims that plaintiff's job in the CSU operating room remained available to plaintiff throughout this time. (Solivan Aff. ¶ 40.) However, plaintiff testified that she had "no idea" whether her job remained open to her. (Krachenfels Dep. at 34.)

### 5. Resignation

As it turned out, February 9, 2011, was plaintiff's last day of work. (Defs.' 56.1 ¶ 9; Krachenfels Dep. at 324.) By letter dated August 2, 2011, plaintiff resigned. (Defs.' 56.1 ¶ 84.) In her deposition, she explained that she grew "tired of the runaround." (Krachenfels Dep. at 345–46.)

### 6. Evidence of Age Discrimination

Plaintiff claims that Peralta, another nurse who could not scrub, was transferred to a different position in the Health System. (*Id.* at 190.) Peralta was between forty and forty-five years old at the time; plaintiff was fifty-five in February 2011. (*Id.* at 190, 296). When asked at her deposition whether she had evidence of age discrimination, plaintiff insisted, "She is younger than me. That's the evidence." (*Id.* at 193.) When pressed for anything else, plaintiff had "nothing to say." (*Id.* at 193–94 ("Q: Okay. What leads you to conclude that her age came into consideration when they gave her that job? A: I have nothing to say. Q: You don't have any evidence to support that? A: I just have nothing to say.").) Plaintiff did testify that

"[p]eople"—referring to surgeons—"like to scrub with young girls," though she admitted that she was "generalizing." (*Id.* at 295.) Plaintiff never heard anyone make a comment about her age. (*Id.* at 296.)

### 7. EEOC Filing

Plaintiff filed a charge of discrimination with the EEOC on January 3, 2012. (Klein Aff. Ex. A, EEOC Charge.) The EEOC issued plaintiff a Notice of Right to Sue on October 18, 2012. (Compl. Ex. A.)

### B. Procedural History

Plaintiff commenced this action on January 15, 2013. Following discovery by the parties, defendants moved for summary judgment on March 6, 2014. Plaintiff filed her opposition to the motion on April 21, 2014, and defendants filed their reply on May 5, 2014. The Court heard oral argument on the motion on June 5, 2014. Thereafter, the Court directed the parties to submit supplemental letters addressing several factual issues raised at the oral argument. Plaintiff submitted her letter on June 6, 2014, and defendants submitted their letter on June 13, 2014. The Court has fully considered the submissions of the parties.

## II. STANDARD OF REVIEW

The standard for summary judgment is well settled. Pursuant to Federal Rule of Civil Procedure 56(a), a court may grant a motion for summary judgment only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Gonzalez v. City of Schenectady*, 728 F.3d 149, 154 (2d Cir. 2013). The moving party bears the burden of showing that he is entitled to summary judgment. *See Huminski v. Corsones*, 396 F.3d 53, 69 (2d Cir. 2005). "A party

asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). The court "'is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments.'" *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 122 (2d Cir. 2004) (quoting *Weyant v. Okst*, 101 F.3d 845, 854 (2d Cir. 1996)); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (summary judgment is unwarranted if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party").

Once the moving party has met its burden, the opposing party "'must do more than simply show that there is some metaphysical doubt as to the material facts . . . . [T]he nonmoving party must come forward with specific facts showing that there is a *genuine issue for trial*.'" *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002) (alteration and emphasis in original) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)). As the Supreme Court stated in *Anderson*, "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." 477 U.S. at 249–50 (citations omitted). Indeed, "the mere existence of *some* alleged factual dispute between the parties alone will not defeat an otherwise properly supported motion for summary judgment." *Id.* at 247–48 (emphasis in original). Thus, the nonmoving party may not rest upon mere conclusory allegations or denials but must set forth "'concrete particulars'" showing that a trial is needed. *R.G. Grp., Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 77 (2d Cir. 1984) (quoting *SEC v. Research Automation Corp.*, 585 F.2d 31, 33 (2d Cir. 1978)). Accordingly, it is insufficient for a party opposing summary judgment "'merely to assert a conclusion without supplying supporting arguments or facts.'" *BellSouth Telecomms., Inc. v. W.R. Grace & Co.*, 77 F.3d 603, 615 (2d Cir. 1996) (quoting *Research Automation Corp.*, 585 F.2d at 33).

III. DISCUSSION

A. ADA Claims

The ADA provides that "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). In the instant case, plaintiff brings four claims under the ADA: (1) failure to accommodate; (2) hostile work environment; (3) constructive discharge; and (4) retaliation. For the reasons set forth *infra*, the Court grants summary judgment for defendants as to these claims.

1. Statute of Limitations

Defendants argue first that plaintiff's ADA claims are time-barred. The Court concludes that the failure to accommodate and hostile work environment claims are indeed time-barred, and summary judgment for defendants is warranted as to these

claims. However, the Court also concludes that the constructive discharge and retaliatory failure to transfer claims were timely filed.

### a. Legal Standard

Under 42 U.S.C. § 2000e-5(e)(1), which is incorporated by reference into the ADA by 42 U.S.C. § 12117(a), a plaintiff in New York has 300 days "after the alleged unlawful employment practice occurred" to file a charge of discrimination with the EEOC. *See, e.g.*, *Elmenayer v. ABF Freight Sys., Inc.*, 318 F.3d 130, 133–34 (2d Cir. 2003); *Harris v. City of New York*, 186 F.3d 243, 247–48 (2d Cir. 1999). To determine whether a claim was timely filed with the EEOC, the incidents of employment discrimination or retaliation "must be categorized as either discrete acts or continuing violations." *Alers v. N.Y.C. Human Res. Admin.*, No. 06-CV-6131 (SLT) (LB), 2008 WL 4415246, at *5 (E.D.N.Y. Sept. 24, 2008) (citing *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114–16 (2002)), *aff'd*, 357 F. App'x 330 (2d Cir. 2009). A claim based upon a discrete act of discrimination or retaliation, "such as termination, failure to promote, denial of transfer, or refusal to hire," is time-barred if the discrete act occurred before the 300-day time period. *Morgan*, 536 U.S. at 113; *see, e.g.*, *Colvin v. State Univ. Coll. at Farmingdale*, No. 13-CV-3595 (SJF) (ARL), 2014 WL 2863224, at *17 (E.D.N.Y. June 19, 2014). This holds true "even when [a discrete act is] related to acts alleged in timely filed charges." *Morgan*, 536 U.S. at 113. By contrast, a claim based upon discrimination or retaliation occurring "over a series of days or perhaps years," such as a hostile work environment, is timely if even one contributing act occurred within the 300-day time period. *Id.* at 116–18; *see, e.g.*, *Elmenayer*, 318 F.3d at 134.

### b. Application

Plaintiff filed her charge of discrimination with the EEOC on January 3, 2012. (*See* Klein Aff. Ex. A, EEOC Charge.) Accordingly, claims based upon unlawful employment practices that occurred before March 9, 2011, are time-barred. *See, e.g.*, *Elmenayer*, 318 F.3d at 134. The Court proceeds to consider when each of plaintiff's claims accrued.

#### i. Failure to Accommodate

The parties agree that plaintiff's failure to accommodate claim is based upon the July 13, 2010 denial of plaintiff's request to work on-call without scrubbing (*see* Defs.' Mem. at 10; Pl.'s Opp'n at 6), and the evidence in the summary judgment record supports their understanding. In particular, on July 13, 2010, the Hospital denied plaintiff's request to work part-time and on-call without scrubbing; the Hospital excused her from scrubbing whenever she had lesions on her hands but denied her the ability to take on-call shifts. This determination clearly occurred more than 300 days before plaintiff filed her EEOC charge. Nevertheless, in an effort to salvage this claim, plaintiff argues that defendants subjected her to a hostile work environment after denying her requested accommodation, and that defendants' actions thereby constituted a continuing violation extending into the 300 day period preceding the filing of her EEOC charge. (Pl.'s Opp'n at 6–7.)

Plaintiff's argument misses the mark. In *Elmenayer*, the Second Circuit held that an employer's rejection of a proposed accommodation "is the sort of 'discrete act' that must be the subject of a complaint to the EEOC within 300 days," even if "the *effect* of the employer's rejection continues to be felt by the employee for as long as he remains employed." 318 F.3d at 135

(emphasis in original). Accordingly, numerous district courts have recognized that a failure to accommodate claim is not a continuing violation, and this Court reaches the same conclusion. *See, e.g.*, *Graham v. Women in Need, Inc.*, No. 13-CV-07063 (LGS), 2014 WL 2440849, at *3 (S.D.N.Y. May 30, 2014) ("The Second Circuit has concluded that the rejection of a request to accommodate is a 'discrete act' with its own statute of limitations of 300 days for filing a complaint before the EEOC."); *Ugactz v. United Parcel Serv., Inc.*, No. 10-CV-1247 (MKB), 2013 WL 1232355, at *5 & n.10 (E.D.N.Y. Mar. 26, 2013) ("Plaintiff's failure to accommodate claims are not continuing violations but discrete actions.") (citing cases); *O'Leary v. Town of Huntington*, No. 11-CV-3754 (JFB) (GRB), 2012 WL 3842567, at *8 (E.D.N.Y. Sept. 5, 2012) ("[A]n employee who continues working after the denial of a reasonable accommodation may not claim a continuing violation."); *Davis v. N.Y. State Office of Mental Health*, No. 05-CV-5599 (ARR) (LB), 2009 WL 5178440, at *6 (E.D.N.Y. Dec. 31, 2009) (recognizing that the continuing violation doctrine does not apply to failure to accommodate claims); *see also Anderson v. N.Y.C. Dep't of Corr.*, No. 12-CV-4064 (RJS) (RLE), 2013 WL 5229790, at *3 (S.D.N.Y. Sept. 17, 2013) (holding that "the continuing violation exception does not apply" where claim based upon discrete acts). Moreover, plaintiff cannot save her untimely failure to accommodate claim by proffering evidence that defendants subjected her to a hostile work environment after denying her proposed accommodation. "[T]he Second Circuit has found that the existence of a hostile environment claim does not revive an otherwise time-barred discrete act of discrimination." *Anderson v. Nassau Cnty. Dep't of Corr.*, 558 F. Supp. 2d 283, 298 (E.D.N.Y. 2008) (citing *Petrosino v. Bell Atl.*, 385 F.3d 210, 220 (2d

Cir. 2004); *Sundaram v. Brookhaven Nat'l Labs.*, 424 F. Supp. 2d 545, 561 (E.D.N.Y. 2006)); *see, e.g.*, *Walia v. Napolitano*, --- F. Supp. 2d ----, No. 11-CV-2512 (ADS) (WDW), 2013 WL 6231175, at *21 (E.D.N.Y. Dec. 2, 2013); *accord Ugactz*, 2013 WL 1232355, at *5–6 (holding that failure to accommodate claim was time-barred, but that hostile work environment claim was timely as a continuing violation). Therefore, plaintiff's claim that defendants failed to accommodate her alleged disability on July 13, 2010, is time-barred.[7]

### ii. Hostile Work Environment

As noted, plaintiff also claims that she was subject to a hostile work environment because of her discoid dermatitis and in retaliation for her exemption from scrubbing duties (the Hospital's accommodation to her for that condition). (Pl.'s Opp'n at 16–17, 23–24.) Specifically, plaintiff testified that she was subject to "badgering," constant harassment, and resentment at work, which she assumed to have been based on her inability to scrub. (*See, e.g.*, Krachenfels Dep. at 189, 192, 236–41, 253, 257.) She relies on the continuing violation doctrine to support the timeliness of this claim. (*See* Pl.'s Opp'n at 6–7.)

Plaintiff notes correctly that a hostile work environment is a continuing violation. *See, e.g.*, *Morgan*, 536 U.S. at 115 (noting that a hostile work environment claim's "very nature involves repeated conduct"). As such, for a claim to be timely filed, only

---

[7] Even if plaintiff had argued that her failure to accommodate claim was timely because she requested reconsideration of defendants' decision to deny her proposed accommodation within 300 days of filing her EEOC charge, which she did not, the Court concludes that "[m]ere requests to reconsider cannot extend limitations periods applicable to the ADA." *O'Leary*, 2012 WL 3842567, at *7.

one act contributing to the hostile work environment must have occurred within the applicable limitations period. *See, e.g.*, *Raneri v. McCarey*, 712 F. Supp. 2d 271, 281 (S.D.N.Y. 2010) ("To defeat the statute of limitations by applying the continuing violation theory, the evidence must show that such a hostile environment was created prior to, and continued into, [the limitations period]."). A court must perform "an individualized assessment of whether incidents and episodes are related," and then determine whether any related incidents or episodes occurred within the limitations period. *McGullam v. Cedar Graphics, Inc.*, 609 F.3d 70, 77 (2d Cir. 2010). If no relevant acts occurred within the limitations period, then the hostile work environment claim must be dismissed. *See, e.g.*, *id.* at 76–78 (dismissing hostile work environment claim where most recent relevant conduct occurred outside the applicable limitations period).

In the instant case, even under a continuing violation theory, plaintiff's hostile work environment claim is untimely because plaintiff left work for good on February 9, 2011—more than 300 days before she filed her claim with the EEOC. (*See* Defs.' 56.1 ¶ 9; Krachenfels Dep. at 324.) Thus, after February 9, 2011, plaintiff was no longer exposed to the harassment, badgering, and resentment that had been directed toward her while she was working in the CSU. Plaintiff actually conceded this fact in her own deposition. (*See* Krachenfels Dep. at 349 ("Q: You weren't at work. So, therefore, you weren't being exposed to any conduct that you found offensive. A: Okay. Q: So I'm asking, what happened? A: I didn't secure another position with them.").) As plaintiff's own testimony makes clear, the only conduct she complains of after February 9, 2011, is defendants' failure to find another position for her in the Health System. The denial of a transfer request,

which occurred when plaintiff was on leave, has no bearing on plaintiff's hostile work environment claim, which requires evidence of harassment in the "workplace." *See, e.g.*, *Gillman v. Inner City Broad. Corp.*, No. 08-CV-8909 (LAP), 2011 WL 181732, at *1 (S.D.N.Y. Jan. 18, 2011); *accord Perry v. Ethan Allen, Inc.*, 115 F.3d 143, 149 (2d Cir. 1997) (holding that hostile work environment claim requires evidence that harassment created "an abusive working environment"). Accordingly, because it is undisputed that plaintiff was not subject to harassment in the workplace after February 9, 2011, the Court concludes that her discrimination and retaliation hostile work environment claims are time-barred. *See Smith v. UAW-GM Legal Servs. Plan*, 48 F. App'x 338, 340 (2d Cir. 2002) (summary judgment) (affirming dismissal of hostile work environment claim as time-barred where plaintiff "was on leave during the 300-day period before she filed her claim with the New York Division of Human Rights").[8]

### iii. Constructive Discharge

In *Flaherty v. Metromail Corp.*, the Second Circuit held that a constructive discharge claim accrues on "the date when [the plaintiff] gave definite notice of her intention to retire." 235 F.3d 133, 138 (2d Cir. 2000); *see, e.g.*, *Fierro v. N.Y.C. Dep't of Educ.*, --- F. Supp. 2d. ----, No. 13-CV-3637 (PAE), 2014 WL 425946, at *3 (S.D.N.Y. Feb. 4, 2014); *Cohen v. City of*

---

[8] The deadline to file a charge of discrimination with the EEOC "is not jurisdictional and, like a statute of limitations, is subject to equitable tolling . . . in rare and exceptional circumstances." *Zerilli-Edelglass v. N.Y.C. Transit Auth.*, 333 F.3d 74, 80 (2d Cir. 2003) (internal citations and quotation marks omitted). In the instant case, plaintiff does not argue for equitable tolling, and the Court finds no basis to apply equitable tolling here.

*New York*, No. 12-CV-1932 (RRM) (RLM), 2013 WL 4010196, at *7 n.5 (E.D.N.Y. Aug. 5, 2013). Here, plaintiff submitted her letter of resignation on August 2, 2011. (Defs.' 56.1 ¶ 84.) Accordingly, plaintiff's constructive discharge claim is timely.

### iv. Retaliation

Plaintiff claims that defendants failed to transfer her to a new position in the Health System, and that defendants' failure to do so was an act of unlawful retaliation. (*See* Pl.'s Opp'n at 16–17.) A retaliation claim premised on the denial of a request to transfer—which is a discrete act, *see, e.g.*, *Colvin*, 2014 WL 2863224, at *17—that occurred on or after March 9, 2011, would be timely. Because plaintiff claims that she was denied a transfer while she was on leave up until August 2, 2011, the Court considers the merits of this claim.

### 2. Failure to Accommodate

Even assuming *arguendo* that plaintiff's failure to accommodate claim were timely, the Court concludes that defendants are entitled to summary judgment on this claim because there is no evidence that plaintiff was disabled within the meaning of the ADA.

### a. Legal Standard

"Discrimination in violation of the ADA includes, *inter alia*, 'not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability.'" *McBride v. BIC Consumer Prods. Mfg. Co., Inc.*, 583 F.3d 92, 96 (2d Cir. 2009) (quoting 42 U.S.C. § 12112(b)(5)(A)). Moreover, a "qualified individual" under the ADA is "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8); *see McBride*, 583 F.3d at 96. Accordingly, a plaintiff can establish a *prima facie* claim of disability discrimination based on the failure to accommodate a disability by proving the following elements:

> (1) plaintiff is a person with a disability under the meaning of the ADA; (2) an employer covered by the statute had notice of his disability; (3) with reasonable accommodation, plaintiff could perform the essential functions of the job at issue; and (4) the employer has refused to make such accommodations.

*McMillan v. City of New York*, 711 F.3d 120, 125–26 (2d Cir. 2013) (citing *McBride*, 583 F.3d at 97). Once a plaintiff has established a *prima facie* case, the burden shifts to the defendant to show "(1) that making a reasonable accommodation would cause it hardship, and (2) that the hardship would be undue." *Mitchell v. Washingtonville Cent. Sch. Dist.*, 190 F.3d 1, 6 (2d Cir. 1999) (citing *Borkowski v. Valley Cent. Sch. Dist.*, 63 F.3d 131, 138 (2d Cir. 1995)); *see also Scalera v. Electrograph Sys., Inc.*, 848 F. Supp. 2d 352, 360 (E.D.N.Y. 2012) ("[O]nce Plaintiff puts forth a prima facie case, the burden shifts to the employer to demonstrate that the employee's proposed accommodation would result in an undue hardship.").

With respect to the first element—whether plaintiff is disabled—the ADA Amendment Act of 2008 ("ADAAA"), effective January 1, 2009, altered the analysis of what constitutes a disability. In particular, "[t]he ADAAA substantially broadened the definition of a disability under the law, in explicit response to *Sutton v. United Air Lines*, 527 U.S. 471 (1999) and

*Toyota Motor Mfg. v. Williams*, 534 U.S. 184 (2002), in which the ADA's terms defining disability had been strictly defined." *Green v. DGG Props. Co., Inc.*, No. 11-CV-1989 (VLB), 2013 WL 395484, at *9 (D. Conn. Jan. 31, 2013) (internal quotation marks and citation omitted); *see also Kravtsov v. Town of Greenburgh*, No. 10-CV-3142 (CS), 2012 WL 2719663, at *10 (S.D.N.Y. July 9, 2012) ("In enacting the ADA, Congress intended to provide broad coverage for individuals with disabilities, and in enacting the ADAAA in 2008, rejected Supreme Court precedent in *Toyota Motor Mfg. v. Williams*, 534 U.S. 184 (2002), as interpreting the term 'substantially limits' to require a greater degree of limitation than was intended." (internal quotation marks and citation omitted)). "While the terms of the statute were not changed, the interpretation of those terms was modified." *Brtalik v. S. Huntington Union Free Sch. Dist.*, No. 10-CV-0010, 2010 WL 3958430, at *7 (E.D.N.Y. Oct. 6, 2010). Specifically, the ADAAA directs courts to construe the term disability "in favor of broad coverage of individuals under [the ADA], to the maximum extent permitted by the terms of [ADA]." 42 U.S.C. § 12102(4)(A).

The ADA defines a "disability" as:

(A) a physical or mental impairment that substantially limits one or more major life activities of such individual;

(B) a record of such an impairment; or

(C) being regarded as having such an impairment.

42 U.S.C. § 12102(1). For a plaintiff to establish that she has a disability under the statute's first subsection (*i.e.*, to show that

she is actually disabled), she must "(1) 'show that [she] suffers from a physical or mental impairment,' (2) 'identify the activity claimed to be impaired and establish that it constitutes a 'major life activity,'' and (3) 'show that [her] impairment 'substantially limits' the major life activity previously identified.'" *Kravtsov*, 2012 WL 2719663, at *10 (quoting *Weixel v. Bd. of Educ.*, 287 F.3d 138, 147 (2d Cir. 2002)).[9]

b. Application

Plaintiff's claimed impairment is discoid dermatitis, and plaintiff identifies sleeping, caring for herself, and working as the major life activities that the discoid dermatitis substantially limited. (*See* Pl.'s Opp'n 8–10.) It is undisputed that sleeping, caring for oneself, and working are major life activities. *See* 42 U.S.C. § 12102(2) (setting forth non-exhaustive list of major life activities including "caring for oneself, . . . sleeping, . . . and working"). The parties dispute whether discoid dermatitis substantially limited plaintiff's ability to perform these activities.

Although the ADA does not define a substantial limitation, *see, e.g., Kravtsov*, 2012 WL 2719663, at *10, the EEOC

_____

[9] An individual "regarded as" disabled, but not actually disabled, cannot bring a failure to accommodate claim as a matter of law. *See* 42 U.S.C. § 12201(h) ("A covered entity under subchapter I, a public entity under subchapter II, and any person who owns, leases (or leases to), or operates a place of public accommodation under subchapter III, need not provide a reasonable accommodation or a reasonable modification to policies, practices, or procedures to an individual who meets the definition of disability in section 12102(1) of this title solely under subparagraph (C) of such section."); *see, e.g., Powers v. USF Holland, Inc.*, 667 F.3d 815, 823 n.7 (7th Cir. 2011) ("[T]he ADAAA clarified that an individual 'regarded as' disabled (as opposed to actually disabled) is not entitled to a 'reasonable accommodation.'" (quoting 42 U.S.C. § 12201(h))).

regulations promulgated after the enactment of the ADAAA make clear that the standard "is not meant to be . . . demanding," 29 C.F.R. § 1630.2(j)(1)(i), and "should not demand extensive analysis," *id.* § 1630.2(j)(1)(iii). Thus, an impairment will be considered a disability under the ADA "'if it substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population.'" *Risco v. McHugh*, 868 F. Supp. 2d 75, 108 n.47 (S.D.N.Y. 2012) (quoting 29 C.F.R. § 1630.2(j)(1)(ii)). An impairment "'need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting.'" *Kravtsov*, 2012 WL 2719663, at *10 (quoting 29 C.F.R. § 1630.2(j)(1)(ii)); *see also Brandon v. O'Mara*, No. 10-CV-5174 (RJH), 2011 WL 4478492, at *7 (S.D.N.Y. Sept. 28, 2011) ("[T]he revised EEOC regulations provide that '[a]n impairment is a disability . . . if it substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population. That is, while '[a]n impairment need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting,' the substantially limits analysis is comparative." (quoting 29 C.F.R. § 1630.2(j)(1)(ii))).

Plaintiff's own deposition testimony provides the only factual basis for her asserted difficulties in performing these major life activities. Even assuming *arguendo* that plaintiff could establish the substantial limitation of a major life activity without medical records, she has not done so here. [10] With respect to sleeping and

showering, plaintiff testified that when her condition "flare[d] up," showering was very painful, and she slept "[v]ery poorly" because the itching was "maddening." (Krachenfels Dep. at 151–52.) The Second Circuit has held that a substantial limitation on sleeping must be one that is "worse than is suffered by a large portion of the nation's adult population." *Colwell v. Suffolk Cnty. Police Dep't*, 158 F.3d 635, 644 (2d Cir. 1998); *accord* 29 C.F.R. § 1630.2(j)(1)(ii) (defining disability to mean impairment that substantially limits the performance of a major life activity *as compared to most people in the general population*" (emphasis added)). Plaintiff's general statement that discoid dermatitis caused her some difficulty sleeping, without any more detail, does not satisfy this standard. As for the pain she experienced while taking showers, there is no evidence that plaintiff was limited in her ability to take showers as a result. (*See* Krachenfels Dep. at 151 ("I have to shower, but I have to deal with the pain.").) While the Court does not mean to minimize the pain plaintiff may feel, the issue is not whether plaintiff felt pain while showering; it is whether that pain, caused by discoid dermatitis, substantially limited her ability to shower in any way. *Compare Verhoff v. Time Warner Cable, Inc.*, 478 F. Supp. 2d

---

[10] "Courts in the Second Circuit have consistently held that when a plaintiff fails 'to offer any medical evidence substantiating the specific limitations to which he claims he is subject due to his condition,' he cannot establish that he is disabled within the meaning of the ADA." *Baerga v. Hosp. For Special Surgery*, No. 97-CV-0230 (DAB), 2003 WL 22251294, at *6 (S.D.N.Y. Sept. 30, 2003) (quoting *Johnson v. St. Clare's Hosp. & Health Ctr.*, No. 96-CV-1425 (MBM), 1998 WL 236235, at *8 (S.D.N.Y. May 13, 1998)) (citing cases). The Second Circuit has not taken a position on this issue, but the First and Third Circuits have both held that medical evidence is not absolutely necessary to support a claim of disability under the ADA. *See Katz v. City Metal Co., Inc.*, 87 F.3d 26, 32 (1st Cir. 1996); *Marinelli v. City of Erie, Pa.*, 216 F.3d 354, 360 (3d Cir. 2000).

933, 939 (N.D. Ohio 2006) (concluding that plaintiff "failed to show that his ability to care for himself [was] significantly restricted in 'condition, manner or duration' as compared to the average person in the general population," where he acknowledged that he could shower, although sometimes "pain and itching cause[d] him to take more time doing so" due to eczema), *aff'd*, 299 F. App'x 488 (6th Cir. 2008), *with E.E.O.C. v. Chevron Phillips Chem. Co., LP*, 570 F.3d 606, 617 (5th Cir. 2009) (holding that plaintiff "submitted sufficient evidence to survive summary judgment on the question of whether she was substantially limited in the major life activity of caring for herself," where plaintiff had attested "that she often did not shower for several days because contact with the water was painful"). Because plaintiff has shown at most that her skin condition was painful at times, she has failed to create a triable issue of fact as to whether her discoid dermatitis substantially limited her ability to care for herself. *See, e.g.*, *O'Kane v. Lew*, No. 10-CV-5325 (PKC), 2013 WL 6096775, at *7 (E.D.N.Y. Nov. 20, 2013) (evidence that psoriasis and arthritic psoriasis were "painful, uncomfortable, and socially isolating," without more, was insufficient to establish substantial limitation of any major life activity).

Nor has plaintiff submitted any evidence that discoid dermatitis substantially impaired her ability to work. For an impairment to substantially limit the major life activity of working, it must render the individual "significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities." *O'Connor v. Huntington U.F.S.D.*, No. 11-CV-1275 (JFB) (ARL), 2014 WL 1233038, at *1 (E.D.N.Y. Mar. 25, 2014) (internal citations

and quotation marks omitted); *see, e.g.*, *Petrone v. Hampton Bays Union Free Sch. Dist.*, No. 03-CV-4359 (SLT) (ARL), 2013 WL 3491057, at *21 (E.D.N.Y. July 10, 2013), *aff'd*, No. 13-2960-CV, 2014 WL 2198612 (2d Cir. May 28, 2014). "A class of jobs encompasses a breadth of positions related to the one a plaintiff cannot perform, not simply analogous positions with slight variations." *Wegner v. Upstate Farms Co-op., Inc.*, 560 F. App'x 22, 2014 WL 998195, at *2 (2d Cir. 2014) (summary order) (citing *Muller v. Costello*, 187 F.3d 298, 313 (2d Cir. 1999)). "The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working." *Cameron v. Cmty. Aid For Retarded Children, Inc.*, 335 F.3d 60, 65 (2d Cir. 2003) (internal citations and quotation marks omitted). [11]

---

[11] The EEOC regulations used to provide explicitly that a substantial impairment in the major life activity of working meant that the individual was "'significantly restricted in the ability to perform either a class of jobs or a broad range of jobs,'" and that "'[t]he inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working.'" *Cameron*, 335 F.3d at 65 (quoting 29 C.F.R. § 1630.2(j)(3)(i)). However, the EEOC "has removed from the text of the regulations a discussion of the major life activity of working" because "no other major life activity receives special attention in the regulation," and "in light of the expanded definition of disability established by the [ADAAA], this major life activity will be used in only very targeted situations." *Interpretive Guidance on Title I of the Americans with Disabilities Act*, 29 C.F.R. Pt. 1630, App. § 1630.2(j) ("*EEOC Interpretive Guidance*"). Nonetheless, the *EEOC Interpretive Guidance*, which the Second Circuit has treated as authoritative, *see, e.g.*, *Norville v. Staten Island Univ. Hosp.*, 196 F.3d 89, 99 (2d Cir. 1999), states that "[i]n the rare cases where an individual has a need to demonstrate that an impairment substantially limits him or her in working, the individual can do so by showing that the impairment substantially limits his or her ability to perform a class of jobs or broad range of jobs in various classes as compared to most people having

Notwithstanding this legal standard, plaintiff contends that discoid dermatitis substantially impaired her ability to work only because "she was restricted in her ability to perform scrub duties." (Pl.'s Opp'n at 10.) Critically, there is no evidence in the record that the inability to scrub precluded plaintiff from performing any nursing job; on this record, the responsibility to scrub pertains only to the duties of a Perioperative RN-OR. Because there is no evidence that plaintiff's condition prevented her from performing any other nursing positions within her qualifications, no reasonable jury could find that plaintiff was substantially limited in her ability to work. *See, e.g.*, *Squibb v. Mem'l Med. Ctr.*, 497 F.3d 775, 783 (7th Cir. 2007) (holding that plaintiff failed to raise triable issue of fact as to whether her back condition substantially impaired her ability to work as a nurse, where evidence showed that she could perform certain nursing jobs); *Sorensen v. Univ. of Utah Hosp.*, 194 F.3d 1084, 1089 (10th Cir. 1999) (holding that plaintiff could not show that an impairment substantially limited her ability to work without establishing how she was substantially limited in performing "the class of regular nurse jobs," not just the specific "flight nurse position" that she had held).

Accordingly, even if plaintiff's failure to accommodate claim were not time-barred, defendants would be entitled to summary judgment on this claim.

3. Constructive Discharge

a. Legal Standard

In the absence of direct evidence of discrimination, a disability discrimination claim brought under the ADA is subject to the burden-shifting framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See, e.g.*, *McMillan*, 711 F.3d at 125; *McBride*, 583 F.3d at 96. Under this framework, a plaintiff must first set forth a *prima facie* case of discrimination in violation of the ADA by showing the following elements: "'(1) his employer is subject to the ADA; (2) he was disabled within the meaning of the ADA; (3) he was otherwise qualified to perform the essential functions of his job, with or without reasonable accommodation; and (4) he suffered adverse employment action because of his disability.'" *McMillan*, 711 F.3d at 125 (quoting *Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 169 (2d Cir. 2006)). If the plaintiff establishes a *prima facie* case of unlawful discrimination, a rebuttable presumption of discrimination arises, and the burden shifts to the defendant to set forth "some legitimate, nondiscriminatory reason" for the adverse employment action. *McDonnell Douglas*, 411 U.S. at 802. Where the defendant articulates such a reason, then the presumption of discrimination is rebutted, and it "simply drops out of the picture." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 510–11 (1993) (citation omitted). The burden then shifts back to the plaintiff to show, without the benefit of any presumptions, that a reasonable jury could conclude by a preponderance of the evidence that his "disability was at least 'a motivating factor' for the adverse employment action." *Hong Yin v. N. Shore LIJ Health Sys.*, --- F. Supp. 2d ----, No. 12-CV-1499 (DRH) (AKT), 2014 WL 2027305, at *10 (E.D.N.Y. May

---

comparable training, skills, and abilities." *EEOC Interpretive Guidance*. Moreover, "[d]emonstrating a substantial limitation in performing the unique aspects of a single specific job is not sufficient to establish that a person is substantially limited in the major life activity of working." *Id.* Accordingly, the test for determining whether a person's ability to work was substantially impaired has not changed.

19, 2014); *see Parker v. Columbia Pictures Indus.*, 204 F.3d 326, 336–37 (2d Cir. 2000).[12] To meet this burden, the plaintiff may rely on evidence presented to establish her *prima facie* case as well as additional evidence. Such additional evidence may include direct or circumstantial evidence of discrimination. *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 99–101 (2003). It is insufficient, however, for a plaintiff merely to show that she satisfies "*McDonnell Douglas*'s minimal requirements of a *prima facie* case" and to put forward "evidence from which a factfinder could find that the employer's explanation . . . was false." *James v. N.Y. Racing Ass'n*, 233 F.3d 149, 157 (2d Cir. 2000). Instead, the key is whether there is sufficient evidence in the record from which a reasonable trier of fact could find in favor of plaintiff on the ultimate issue, *i.e.*, whether the record contains sufficient evidence to support an inference of discrimination. *See id.*; *Connell*

[12] Following the Supreme Court's decisions in *University of Texas Southwestern Medical Center v. Nassar*, 133 S. Ct. 2517 (2013), and *Gross v. FBL Financial Services, Inc.*, 129 S. Ct. 2343 (2009), it is an open question in this Circuit whether an ADA plaintiff must now show that disability discrimination (or the plaintiff's protected activity, in a retaliation claim) was a but-for cause of the adverse employment action. *See Castro v. City of New York*, --- F. Supp. 2d ----, No. 10-CV-4898 (NG) (VVP), 2014 WL 2582830, at *14 n.34 (E.D.N.Y. June 5, 2014) ("[T]he question of whether the heightened, 'but-for' standard of causation for Title VII retaliation claims . . . applies to claims asserted under the ADA, is one that has not yet been addressed by the Second Circuit."); *see also Tse v. New York Univ.*, No. 10-CV-7207 (DAB), 2013 WL 5288848, at *18 n.18 (S.D.N.Y. Sept. 19, 2013); *Najjar v. Mirecki*, No. 11-CV-5138 (KBF), 2013 WL 3306777, at *7 (S.D.N.Y. July 2, 2013). This Court need not resolve that issue in this case because, as discussed *infra*, plaintiff has not produced sufficient evidence from which a rational jury could find that she was constructively discharged, or that disability discrimination occurred, even under the "motivating factor" standard.

*v. Consol. Edison Co.*, 109 F. Supp. 2d 202, 207–08 (S.D.N.Y. 2000).

### b. Application

To satisfy the adverse employment action of her *prima facie* case, plaintiff claims that her voluntary resignation on August 2, 2011, constituted a constructive discharge. *Cf. O'Connor*, 2014 WL 1233038, at *9 ("A constructive discharge is 'functionally the same as an actual termination' and therefore is considered an adverse employment action." (quoting *Pa. State Police v. Suders*, 542 U.S. 129, 148 (2004))). A constructive discharge occurs in the absence of a "discrete, identifiable act," when an employer, "'rather than directly discharging an individual, intentionally creates an intolerable atmosphere that forces an employee to quit voluntarily.'" *Flaherty*, 235 F.3d at 138 (quoting *Chertkova v. Conn. Gen. Life Ins. Co.*, 92 F.3d 81, 89 (2d Cir. 1996)); *see also Morris v. Schroder Cap. Mgmt. Int'l*, 481 F.3d 86, 89 (2d Cir. 2007) (stating that constructive discharge "occurs 'when the employer, rather than acting directly, deliberately makes an employee's working conditions so intolerable that the employee is forced into an involuntary resignation.'" (quoting *Pena v. Brattleboro Retreat*, 702 F.2d 322, 325 (2d Cir. 1983))). "To find that an employee's resignation amounted to a constructive discharge, 'the trier of fact must be satisfied that the . . . working conditions would have been so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign.'" *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 73 (2d Cir. 2000) (quoting *Lopez v. S.B. Thomas*, 831 F.2d 1184, 1188 (2d Cir. 1987)). This inquiry is an objective one; a court considers how "a reasonable person in the employee's position" would have found her work conditions. *Petrosino*, 385 F.3d at 230. In addition, in an ADA case, the

plaintiff must establish that the constructive discharge "occurred in circumstances giving rise to an inference of discrimination on the basis of" plaintiff's disability. *Terry v. Ashcroft*, 336 F.3d 128, 152 (2d Cir. 2003) (internal quotation marks and citations omitted). Ultimately, "[t]he standard for constructive discharge is a demanding one." *De La Peña v. Metro. Life Ins. Co.*, 953 F. Supp. 2d 393, 419 (E.D.N.Y. 2013), *aff'd*, 552 F. App'x 98 (2d Cir. 2014).

In this case, even when resolving all factual disputes in plaintiff's favor and considering those facts in the light most favorable to plaintiff, no reasonable jury could find that plaintiff's treatment was objectively intolerable. First, much of the evidence of harassment is too vague to permit such a finding. *See, e.g.*, *Fraser v. State of N.Y., SUNY at Stony Brook*, 769 F. Supp. 91, 94 (E.D.N.Y. 1991) (granting summary judgment to defendant on constructive discharge claim where plaintiff submitted only "conclusory statements" of an intolerable work environment); *accord Edwards v. Elmhurst Hosp. Ctr.*, No. 07-CV-2452 (RRM), 2009 WL 6683365, at *4 (E.D.N.Y. Sept. 17, 2009) ("[T]he Second Circuit has pointed out that '[t]o allow a party to defeat a motion for summary judgment by offering purely conclusory allegations of discrimination, absent any concrete particulars, would necessitate a trial in all Title VII [and ADA] cases.'" (quoting *Meiri v. Dacon*, 759 F.2d 989, 997 (2d Cir. 1985)) (brackets in original)), *report & recommendation adopted*, 2010 WL 2874113 (E.D.N.Y. July 19, 2010). Specifically, although plaintiff testified that she experienced "badgering" by her coworkers that became "worse and worse on a daily basis" (Krachenfels Dep. at 189), she could not articulate a concrete basis for this feeling (*see id.* at 249 ("Q: Okay. You are claiming that you got an accommodation, and the attitude of these co-workers of yours

changed, correct? A: Uh-huh, yes. Q: And I'm asking you, what evidence do you have that suggests that those two things are linked? A: You would have to be there to understand it.")). Second, even the specific examples of hostility toward plaintiff taken together—such as Dr. Glassman cursing at plaintiff and Cifu yelling with her finger in plaintiff's face—do not satisfy the demanding standard to find a constructive discharge. In short, "[a]n employee is not constructively discharged because she does not like her assignments, receives unfair criticism, or is yelled at by supervisors." *Katz v. Beth Israel Med. Ctr.*, No. 95-CV-7183 (AGS), 2001 WL 11064, at *14 (S.D.N.Y. Jan. 4, 2001); *see, e.g.*, *Spence v. Md. Cas. Co.*, 995 F.2d 1147, 1149–50, 1156–58 (2d Cir. 1993) (no constructive discharge claim despite evidence that plaintiff was "ranted and cursed" at). These episodes—even if traumatizing to plaintiff—cannot support a rational finding that plaintiff's experience in the Hospital was so intolerable that a reasonable person in her position would have felt compelled to resign. Moreover, "[t]he fact that a plaintiff had been out on leave for a time prior to her resignation makes it less likely that the resignation was prompted by an atmosphere so intolerable that a reasonable person would have felt compelled to resign." *Katz*, 2001 WL 11064, at *12; *see also Weisbecker v. Sayville Union Free Sch. Dist.*, 890 F. Supp. 2d 215, 235 (E.D.N.Y. 2012) ("As a threshold matter, plaintiff was on leave during the time of the recommendation, so plaintiff's 'working conditions' could not have been so intolerable that the plaintiff was forced into an involuntary resignation.").

In addition, no reasonable jury could conclude that the Hospital or Health System deliberately created an intolerable environment for plaintiff. *See, e.g.*, *Adams v. Festival Fun Parks, LLC*, 560 F. App'x 47,

2014 WL 1099215, at *2 (2d Cir. 2014) (summary order) ("Adams has not adduced sufficient evidence to create a material question of fact regarding whether Festival deliberately created the negative work atmosphere of which Adams complains."). In particular, the loss in pay that plaintiff suffered by losing the ability to take on-call shifts could not, in this case, support a finding that defendants meant to push plaintiff out of her job. Even though plaintiff testified that the loss in income was "substantial" (Krachenfels Dep. at 191), it is undisputed that the Hospital offered plaintiff a full-time position in an effort to compensate her for the income she would lose by no longer working on-call shifts (*id.* at 197 ("Q: Okay. So when you were no longer able to do the on call because of the hospital's decision regarding the staffing, okay, they chose to offer you the opportunity to supplement your income; is that correct? A: Yes.")). It can hardly be said that the Hospital or Health System intended for plaintiff to resign by offering her a full-time position. Nor do defendants' actions following February 9, 2011, support a constructive discharge. Plaintiff contends that defendants were unhelpful in her search for a new job. What she ignores, however, is that she decided to leave her position in the CSU even though no rational jury could find that her work environment was intolerable. Thus, even if defendants subsequently offered plaintiff only entry level positions beneath her qualifications as an alternative to her job in the CSU, no reasonable juror could equate that course of action with a demotion. *Cf. Scott v. Harris Interactive, Inc.*, 512 F. App'x 25, 27–28 (2d Cir. 2013) (summary order) (noting that demotion may constitute evidence of constructive discharge). It is not enough for plaintiff to establish that she did not like her job in the CSU and was dissatisfied with defendants' efforts to secure her a different job. *See, e.g.,*

*Spence*, 995 F.2d at 1156 (holding that "a constructive discharge cannot be proven merely by evidence that an employee . . . did not receive a raise, or preferred not to continue working for that employer"); *Gumbs v. Hall*, 51 F. Supp. 2d 275, 283 (W.D.N.Y. 1999) (rejecting constructive discharge claim where evidence showed that plaintiff was "less than satisfied with the alternatives offered to her, because of her subjective belief that they would be a step down from her prior position"), *aff'd*, 205 F.3d 1323 (2d Cir. 2000).

Finally, plaintiff can point to only one comment by one coworker indicating that any negative actions directed toward her related to plaintiff's inability or unwillingness to scrub. One fellow nurse told plaintiff, "you have to admit, Annmarie, you only do 50 percent of your job." (Krachenfels Dep. at 253.) That is all. With respect to the surgeons in the CSU, plaintiff testified that she did not think any of the surgeons disliked her because of her hand condition. (*Id.* at 295.) As for Cifu, plaintiff could only "guess" at what motived Cifu to harass her. (*Id.* at 267.) On the basis of this evidence, plaintiff has failed to create a triable issue of fact as to whether the conditions of her workplace "occurred in circumstances giving rise to an inference of discrimination on the basis of" plaintiff's disability. *Terry*, 336 F.3d at 152.

In sum, a reasonable jury could not find a constructive discharge motivated by disability discrimination.[13]

---

[13] For substantially the same reasons discussed *supra*, even if plaintiff's hostile work environment claim were not time-barred, a reasonable jury could not find that plaintiff's working conditions were "severe or pervasive enough to create an objectively hostile or abusive work environment." *Feingold v. New York*, 366 F.3d 138, 150 (2d Cir. 2004).

## 4. Retaliation

### a. Legal Standard

Retaliation claims brought under the ADA are examined under the same *McDonnell Douglas* burden-shifting framework discussed *supra*. *See, e.g.*, *Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d Cir. 2002). To establish a *prima facie* case of retaliation under the ADA, the plaintiff must show the following elements: "(1) he engaged in an activity protected by the ADA; (2) the employer was aware of this activity; (3) the employer took adverse employment action against him; and (4) a causal connection exists between the alleged adverse action and the protected activity." *Id.*

### b. Application

Plaintiff claims that defendants failed to transfer her to a different position in the Health System in retaliation for her request not to scrub in July 2010.[14] (*See* Pl.'s Opp'n at 17.) Defendants are entitled to summary judgment on this claim because, on this record, no reasonable jury could find that defendants' failure to transfer plaintiff amounted to an adverse employment action. Moreover, even assuming *arguendo* that plaintiff could establish a *prima facie* case of retaliation, the Court concludes that

defendants have proffered a legitimate, non-discriminatory reason for denying her job applications, and plaintiff has failed to come forward with evidence from which a reasonable jury could find that retaliation was a motivating factor behind the transfer denial.[15]

#### i. *Prima Facie* Case

The Court first concludes as a matter of law that plaintiff's inability to secure a transfer does not constitute an adverse employment action in this case. The Supreme Court has defined an "adverse employment action" in the Title VII retaliation context (distinct from and broader than the standard in the Title VII discrimination context) to mean an action that is "materially adverse" and that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (internal citations omitted). The same definition applies to retaliation claims under the ADA. *Platt v. Inc. Vill. of Southampton*, 391 F. App'x 62, 64 (2d Cir. 2010) (summary order); *Ragusa v. Malverne Union Free Sch. Dist.*, 381 F. App'x 85, 90 (2d Cir. 2010) (summary order).

In the context of a discrimination claim (as opposed to a retaliation claim), the Second Circuit has held that "[a] transfer denial is adverse when 'the sought for position is materially more advantageous than the employee's current position, whether because of prestige, modernity, training opportunity, job security, or some other objective indicator of desirability.'" *Moore v. Metro. Transp. Auth.*, No. 07-CV-

---

[14] Plaintiff has also alleged that defendants retaliated against her request for an accommodation by subjecting her to a hostile work environment. For the reasons discussed *supra*, any hostile work environment claim is time-barred. However, the Court has considered all evidence concerning defendants' conduct and plaintiff's work environment as "background evidence" in support of plaintiff's timely claim for retaliatory failure to transfer. *See, e.g.*, *Morgan*, 536 U.S. at 113 (holding that acts taken outside the limitations period may be considered as "background evidence" in evaluating the merits of a timely claim).

[15] For the reasons discussed *supra* in note 10, the Court assumes *arguendo* that the "motivating factor" standard, and not the more demanding "but-for" standard, applies to an ADA retaliation claim.

3561 (DAB), 2013 WL 7759749, at *11 (S.D.N.Y. Aug. 22, 2013) (quoting *Beyer v. Cnty. of Nassau*, 524 F.3d 160, 165 (2d Cir. 2008)). "[I]f a transfer is truly lateral and involves no significant changes in an employee's conditions of employment, the fact that the employee views the transfer either positively or negatively does not of itself render the denial or receipt of the transfer an adverse employment action." *Williams v. R.H. Donnelley, Corp.*, 368 F.3d 123, 128 (2d Cir. 2004). Although the definition of an adverse employment action standard is relaxed for a retaliation claim, *see supra*, a plaintiff asserting retaliation in the form of a denied transfer is not completely relieved of showing some facts enabling the factfinder to compare the plaintiff's desired position to her actual position. *See Taylor v. N.Y.C. Dep't of Educ.*, No. 11-CV-3582, 2012 WL 5989874, at *10 (E.D.N.Y. Nov. 30, 2012) ("The courts in this Circuit have generally declined to find that transfers (or denials of transfers) amount to adverse employment actions, even in the context of a retaliation claim, where the action results merely in 'an inconvenience, such as an increased commute or unfavorable hours.'" (quoting *Antonmarchi v. Consol. Edison Co. of N.Y., Inc.*, No. 03-CV-7735, 2008 WL 4444609, at *15 (S.D.N.Y. Sept. 29, 2008)).

Critically, in the instant case, the record lacks evidence about the specific positions in the Health System to which plaintiff applied. Even plaintiff's opposition papers do not identify a particular position to which plaintiff applied that would have been more advantageous than her position in the CSU. This dearth of evidence is fatal to plaintiff's retaliation claim. "As the Second Circuit . . . has noted in the context of a failure to promote claim, a specific application is required to 'ensure that, at the very least, the plaintiff employee alleges a particular adverse employment action.'" *Wright v.*

*Goldman, Sachs & Co.*, 387 F. Supp. 2d 314, 323 (S.D.N.Y. 2005) (quoting *Petrosino*, 385 F.3d at 227)). "[T]he requirement ensures that the fact finder is not left to speculate as to the qualifications of the competing candidates, the damages to be derived from the salary of unknown jobs, the availability of alternative positions, the plaintiff's willingness to serve in them (e.g., in other locales or on other shifts), etc." *Petrosino*, 385 F.3d at 227. Similarly, when evaluating failure to transfer claims on summary judgment, courts have required the plaintiff to present some evidence about a particular position to which she sought to be transferred. *See, e.g., Divers v. Metro. Jewish Health Sys.*, No. 06-CV-6704 (RRM) (JMA), 2009 WL 103703, at *11 (E.D.N.Y. Jan. 14, 2009) ("[U]nlike the cases in which a denied transfer has been held to constitute an adverse employment action, Divers never asked to be transferred to a specific position and thus was never denied a position for which she actually applied. Additionally, there is no evidence in the record establishing that any comparable positions for which she was qualified were even available. Thus, Divers has come forth with no 'objective indicia' that a jury could use to determine whether MJHS' handling of Divers' first transfer request 'created a materially significant disadvantage' for Divers." (quoting *Beyer*, 524 F.3d at 163–64)), *aff'd*, 383 F. App'x 34 (2d Cir. 2010); *Wright*, 387 F. Supp. 2d at 323 (granting summary judgment to defendants on failure to transfer claim, where plaintiff had "not introduced any evidence that he actually applied for a specific position within Goldman, stating at his deposition only that he requested a transfer to 'any other department'"). Although these decisions concern discrimination claims (as opposed to retaliation claims), their analysis applies with equal force to the lower standard for an adverse employment action in a retaliation

claim. Absent more concrete evidence supporting plaintiff's retaliatory failure to transfer argument, a reasonable factfinder could not conclude that defendants' failure to transfer plaintiff to a different position in the Health System "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *White*, 548 U.S. at 68; *accord Bowen-Hooks v. City of New York*, No. 10-CV-5947 (MKB), 2014 WL 1330941, at \*29 (E.D.N.Y. Mar. 31, 2014) (granting summary judgment on failure to transfer claim where plaintiff never actually requested a particular transfer that was denied).

### ii. Legitimate, Non-Retaliatory Reason

Assuming *arguendo* that plaintiff could establish a *prima facie* case of retaliation, the Court concludes that defendants have proffered a legitimate, non-retaliatory reason for rejecting plaintiff's applications to other positions in the Health System. In short, defendants have presented uncontroverted evidence that plaintiff did not obtain a transfer because she was too limited in her job search, was not qualified for all positions to which she applied, and did not conduct herself professionally in her job interviews. (*See* Solivan Aff. ¶¶ 34–39.) For instance, plaintiff applied for a position in Home Care, which called plaintiff for an interview; plaintiff never returned the call. (*Id.* ¶ 37.) Plaintiff also applied for a night shift position in Palliative Care in April 2011; however, during her interview, she asked numerous times whether she could work the day shift. (Solivan Aff. ¶ 35; Krachenfels Dep. at 341.) According to Solivan, Palliative Care denied her application because they needed night shift nurses and feared that plaintiff would move to the day shift as soon as she could. (Solivan Aff. ¶ 35.) In another interview for a different position, plaintiff appeared dressed in jeans

and flip flops and, when she entered the room, began playing with a blood pressure machine. (*Id.* ¶ 39.) The interviewer determined that plaintiff was not a good fit for the position. (*Id.*) This evidence suffices to shift the burden back to plaintiff to prove that defendants' proffered reasons for denying her transfer requests were pretext for retaliation. *See, e.g.*, *Boyer v. Riverhead Cent. Sch. Dist.*, 343 F. App'x 740, 742 (2d Cir. 2009) (summary order) (holding that "the employer's explanation that it made its hiring decision based on interview performances is sufficient to shift burden to plaintiff to show that the explanation is a pretext" (citing *Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 105–07 (2d Cir. 2001))); *McCoy v. People Care Inc.*, No. 11-CV-2689 (RA), 2013 WL 5313433, at \*6 (S.D.N.Y. Sept. 20, 2013) (noting that plaintiff's demeanor and inappropriate responses to questions during interview are legitimate reasons for failing to hire or promote (citing cases)).

### iii. Pretext

Because defendants have articulated a legitimate, non-retaliatory reason why plaintiff was not transferred to a different position in the Health System, the Court turns to the ultimate question of whether plaintiff has presented evidence from which a reasonable jury could find that plaintiff's request for an accommodation was a motivating factor in defendants' failure to transfer her. *See, e.g.*, *Treglia*, 313 F.3d at 721 ("If a defendant meets this burden, 'the plaintiff must point to evidence that would be sufficient to permit a rational factfinder to conclude that the employer's explanation is merely a pretext for impermissible retaliation.'" (quoting *Cifra v. G.E. Co.*, 252 F.3d 205, 216 (2d Cir. 2001))).

Plaintiff contends that defendants' decision to prevent plaintiff from working

on-call only after she requested an accommodation is evidence of retaliatory intent. (Pl.'s Opp'n at 17–18.) This fact alone is insufficient to survive summary judgment. Even if plaintiff had been permitted to work on-call without restriction before in 2008 and 2009, from which a rational factfinder could infer that the Hospital changed its policy with respect to on-call nurses and scrubbing only after plaintiff requested a formal accommodation, it is uncontroverted that defendants' policy requiring on-call nurses to scrub was put in place for patient safety. (*See* Defs.' ¶ 37; *see also* Krachenfels Dep. at 161 (acknowledging that on-call nurses had to scrub "[b]ecause if the scrub fainted, the RN had to step into that place").) The Second Circuit has held that no reasonable jury could infer an improper retaliatory motive from a defendant's change in policy, where legitimate safety concerns indisputably motivated the change. *Gaines v. N.Y.C. Transit Auth.*, 353 F. App'x 509, 510–11 (2d Cir. 2009) (summary order) (citing *Shannon v. N.Y.C. Transit Auth.*, 332 F.3d 95, 103 (2d Cir. 2003)).

Moreover, there is no other evidence from which a reasonable jury could infer that defendants harbored an improper retaliatory animus. The one comment about plaintiff's inability or unwillingness to scrub was made by a fellow nurse, not by anyone involved in the defendants' decision making processes. *See, e.g.*, *Tomassi v. Insignia Fin. Grp., Inc.*, 478 F.3d 111, 115 (2d Cir. 2007) ("[R]emarks made by someone other than the person who made the decision adversely affecting the plaintiff may have little tendency to show that the decision-maker was motivated by the discriminatory sentiment expressed in the remark."). Moreover, for the reasons discussed *supra* in connection with plaintiff's constructive discharge claim, there is no evidence that defendants created an intolerable

environment for plaintiff after she requested an accommodation. For all those reasons and the reasons stated here, no reasonable jury could find that defendants were motivated by plaintiff's request for an accommodation in denying her requests for a transfer in 2011.

\* \* \*

In sum, defendants are entitled to summary judgment on plaintiff's retaliatory failure to transfer claim.

## B. Age Discrimination Claims

### 1. Legal Standard

The ADEA states that it is "unlawful for an employer . . . to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). The overriding issue in an age discrimination case is whether the plaintiff has met her burden of proving that "age was the 'but-for' cause of the challenged employer decision." *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 178 (2009) (holding that ADEA plaintiff cannot establish disparate treatment by proving that age was simply a motivating factor in adverse employment decision). In the absence of direct evidence of discrimination, claims for employment discrimination based on age are analyzed under the *McDonnell Douglas* burden-shifting framework set forth *supra*. *See, e.g.*, *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 106 (2d Cir. 2010) (holding that the Supreme Court's decision in *Gross* did not disturb "the [*McDonnell Douglas*] burden-shifting framework for ADEA cases that has been consistently employed in [the Second] Circuit"). A plaintiff establishes a *prima facie* case of age discrimination under the

ADEA by showing "(1) that she was within the protected age group, (2) that she was qualified for the position, (3) that she experienced adverse employment action, and (4) that such action occurred under circumstances giving rise to an inference of discrimination." *Id.* at 107.

## 2. Application

Plaintiff claims that defendants' failure to transfer her to a different position within the Health System constitutes age discrimination. In support of this claim, she relies on her deposition testimony, in which she stated her belief that Peralta, who was between forty and forty-five years old, was transferred to a different position in the Health System because she could not scrub. (Krachenfels Dep. at 190–94.) Defendants are entitled to summary judgment on this claim, as well, because no reasonable jury could conclude that plaintiff has established a *prima facie* case of age discrimination.

First, plaintiff's age discrimination claim fails for the same reason that her retaliation claim has no merit: there is insufficient evidence concerning the positions to which plaintiff applied and for which she was qualified. *Cf. Chapotkat v. Cnty. of Rockland*, No. 11-CV-06209 NSR, 2014 WL 1373531, at *4 (S.D.N.Y. Apr. 4, 2014) (holding that plaintiff must show "that she applied for an available position for which she was qualified" in order to establish *prima facie* case of failure to promote brought under ADEA (internal quotations omitted)).[16] Without any such evidence, a

reasonable jury could not conclude that plaintiff suffered an adverse employment action by being denied a transfer. *See supra.*

Moreover, even assuming *arguendo* that plaintiff suffered an adverse employment action in the form of a denied request to transfer, the Court concludes that plaintiff has failed to raise even a triable issue of fact as to whether the denial of a transfer request occurred under circumstances giving rise to an inference of discrimination. Several key facts are missing. Which position was Peralta assigned? Did plaintiff apply to that position? Was plaintiff qualified for that position? Was Peralta? The record sheds no light on these questions. Indeed, plaintiff herself conceded that she has no evidence— other than Peralta's age and her belief that Peralta was transferred out of the CSU—to support her age discrimination claim. (*See* Krachenfels Dep. at 193–94 ("Q: Okay. What leads you to conclude that her age came into consideration when they gave her that job? A: I have nothing to say. Q: You don't have any evidence to support that? A: I just have nothing to say.").) No reasonable jury could infer that plaintiff's age was a but-for cause of her inability to secure a transfer out of the CSU merely from the facts that Peralta was ten to fifteen years younger than plaintiff and was transferred elsewhere within the Health System. *See, e.g., Mandell v. Cnty. of Suffolk*, 316 F.3d 368, 379 (2d Cir. 2003) ("A plaintiff relying on disparate treatment evidence must show she was similarly situated in all material respects to the individuals with whom she seeks to compare herself." (internal citations and quotation marks omitted)); *Bruder v. Jewish Bd. of Family & Children's Servs.*, No. 10-CV-5951 (MKB), 2013 WL 789231, at *6 (E.D.N.Y. Mar. 4, 2013) (holding that "age is insufficient, without more, to establish an inference of age discrimination").

---

[16] Plaintiff appears to argue that she was qualified for "a transfer"—without identifying a particular position—by noting that she was a qualified nurse. (*See* Pl.'s Opp'n at 19.) By plaintiff's own admission, however, she would not have been automatically qualified to perform any other nursing job. (*See* Krachenfels Dep. at 342.)

## C. NYSHRL Claims

Having determined that the federal claims against defendants do not survive summary judgment, the Court concludes that retaining jurisdiction over any state law claims is unwarranted. *See* 28 U.S.C. § 1367(c)(3); *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966). "In the interest of comity, the Second Circuit instructs that 'absent exceptional circumstances,' where federal claims can be disposed of pursuant to Rule 12(b)(6) or summary judgment grounds, courts should 'abstain from exercising pendent jurisdiction.'" *Birch v. Pioneer Credit Recovery, Inc.*, No. 06-CV-6497T, 2007 WL 1703914, at *5 (W.D.N.Y. June 8, 2007) (quoting *Walker v. Time Life Films, Inc.*, 784 F.2d 44, 53 (2d Cir. 1986)).

In the instant case, the Court, in its discretion, "'decline[s] to exercise supplemental jurisdiction'" over plaintiff's state law claims because "it 'has dismissed all claims over which it has original jurisdiction.'" *Kolari v. N.Y. Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir. 2006) (quoting 28 U.S.C. § 1367(c)(3)); *see also Cave v. E. Meadow Union Free Sch. Dist.*, 514 F.3d 240, 250 (2d Cir. 2008) ("We have already found that the district court lacks subject matter jurisdiction over appellants' federal claims. It would thus be clearly inappropriate for the district court to retain jurisdiction over the state law claims when there is no basis for supplemental jurisdiction."); *Karmel v. Liz Claiborne, Inc.*, No. 99-CV-3608, 2002 WL 1561126, at *4 (S.D.N.Y. July 15, 2002) ("Where a court is reluctant to exercise supplemental jurisdiction because of one of the reasons put forth by § 1367(c), or when the interests of judicial economy, convenience, comity and fairness to litigants are not violated by refusing to entertain matters of state law, it should decline supplemental jurisdiction and allow the plaintiff to decide whether or not to pursue the matter in state court.").

Accordingly, pursuant to 28 U.S.C. § 1367(c)(3), the Court declines to retain jurisdiction over the remaining state law claims given the absence of any federal claims that survive summary judgment.[17]

## IV. CONCLUSION

For the reasons set forth herein, the Court grants defendants' motion for summary judgment in its entirety with respect to the federal claims. The Court declines to exercise supplemental jurisdiction over the state law claims and thus dismisses those claims without prejudice. The Clerk of the Court shall enter judgment accordingly and close this case.

SO ORDERED.

_____
JOSEPH F. BIANCO
United States District Judge

Dated: July 29, 2014
        Central Islip, NY

*        *        *

Plaintiff is represented by Kathleen Ann Tirelli, Scott Michael Mishkin, P.C., One Suffolk Square, Suite 240, Islandia, NY 11749. Defendants are represented by Jessica C. Moller, Bond, Schoeneck & King PLLC, 1010 Franklin Avenue, Suite 200,

---

[17] Because the Court grants summary judgment to defendants on all federal claims and declines to exercise supplemental jurisdiction over the state claims, the Court need not address the Health System's argument that it cannot be held liable because it was not plaintiff's employer.

Garden City, NY 11530, and Robert Arthur
LaBerge, Bond, Schoeneck & King PLLC,
One Lincoln Center, 16th Floor, Syracuse,
NY 13202.